Filed 1/17/23 (unmodified opn. attached)
<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| NATOMAS UNIFIED SCHOOL DISTRICT, | C093475 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2019-8000-3194-CU-WM-GDS) |
| v. | |
| SACRAMENTO COUNTY BOARD OF EDUCATION, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant, | NO CHANGE IN JUDGMENT |
| I.O., a Minor, etc., | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael W. Jones, Judge. Reversed.

Teresa Stinson, Elizabeth Linton; Weintraub Tobin Chediak Coleman Grodin Law Corporation and Brendan J. Begley for Defendant and Appellant.

DLA Piper US, Stanley J. Panikowski, Gaspard Rappoport and Amanda McCaffrey for Former School District Superintendents as Amici Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Michael L. Newman, Assistant Attorney General, Srividya Panchalam, Benjamin T. Conway, Carly J. Munson and Alexis M. Piazza, Deputy Attorneys General for the Attorney General of California as Amici Curiae on behalf of Defendant and Appellant.

C. Athena Roussos; Mary M. Sechser for Real Party in Interest and Appellant.

Abigail Trillin, William S. Koski; Cynthia L. Rice, Reina Canale, Phyllis Shafton Katz; Nedra Shawler and Joyeta Basu for Youth & Education Law Project Stanford Law School, California Rural Legal Assistance, Inc., and Legal Services for Children as Amici Curiae on behalf of Real Party in Interest and Appellant.

Alexandra Santa Ana, Mona Tawatao; Stephanie Horwitz, Michael Harris; Victor Leung; Linnea Nelson, Brandon Greene; Jonathan Markovitz and Bardis Vakili for Equal Justice Society, National Center for Youth Law, American Civil Liberties Union Foundation of Southern California, American Civil Liberties Union Foundation of Northern California and ACLU Foundation of San Diego & Imperial Counties as Amici Curiae on behalf of Real Party in Interest and Appellant.

Mary Louise Frampton as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Orbach Huff & Henderson and Sarah L.W. Sutherland for Plaintiff and Respondent.


THE COURT:

It is ordered that the opinion filed herein on December 22, 2022, be modified as follows:


On page 24, the following footnote is added to the end of the first full paragraph, before part III of the Discussion:

> In a petition for rehearing, the District argues it should have an opportunity to conduct a new hearing on I.O.'s proposed expulsion from his middle school—even though, at this point, I.O. has long since graduated from his middle school. The District argues a rehearing would be appropriate under

2

section 48923, subdivision (a), which provides: "If the county board finds that relevant and material evidence exists which . . . was improperly excluded at the hearing before the governing board, it may do either of the following:  [¶]  (1) Remand the matter to the governing board for reconsideration . . . .  [¶]  (2) Grant a hearing de novo upon reasonable notice thereof to the pupil and to the governing board."  But the District did more than exclude relevant and material evidence; it also failed to conduct the appropriate inquiry under section 48915.  For that reason, we reject the District's reliance on section 48923, subdivision (a).  (See § 48923, subd. (c) [for most types of legal errors, the county board will not remand the matter for a new hearing; it will instead enter an order "reversing the decision of the governing board"].)

This modification does not change the judgment.  Respondent's petition for rehearing is denied.


FOR THE COURT:


_____/s/_____
ROBIE, Acting P. J.



_____/s/_____
BOULWARE EURIE, J.



_____/s/_____
HOCH, J.*

_____

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/22/22 (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| NATOMAS UNIFIED SCHOOL DISTRICT, | C093475 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2019-8000-3194-CU-WM-GDS) |
| v. | |
| SACRAMENTO COUNTY BOARD OF EDUCATION, | |
| Defendant and Appellant; | |
| I.O., a Minor, etc., | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael W. Jones, Judge. Reversed.

Teresa Stinson, Elizabeth Linton; Weintraub Tobin Chediak Coleman Grodin Law Corporation and Brendan J. Begley for Defendant and Appellant.

DLA Piper US, Stanley J. Panikowski, Gaspard Rappoport and Amanda McCaffrey for Former School District Superintendents as Amici Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Michael L. Newman, Assistant Attorney General, Srividya Panchalam, Benjamin T. Conway, Carly J. Munson and Alexis M. Piazza, Deputy Attorneys General for the Attorney General of California as Amici Curiae on behalf of Defendant and Appellant.

C. Athena Roussos; Mary M. Sechser for Real Party in Interest and Appellant.

Abigail Trillin, William S. Koski; Cynthia L. Rice, Reina Canale, Phyllis Shafton Katz; Nedra Shawler and Joyeta Basu for Youth & Education Law Project Stanford Law School, California Rural Legal Assistance, Inc., and Legal Services for Children as Amici Curiae on behalf of Real Party in Interest and Appellant.

Alexandra Santa Ana, Mona Tawatao; Stephanie Horwitz, Michael Harris; Victor Leung; Linnea Nelson, Brandon Greene; Jonathan Markovitz and Bardis Vakili for Equal Justice Society, National Center for Youth Law, American Civil Liberties Union Foundation of Southern California, American Civil Liberties Union Foundation of Northern California and ACLU Foundation of San Diego & Imperial Counties as Amici Curiae on behalf of Real Party in Interest and Appellant.

Mary Louise Frampton as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Orbach Huff & Henderson and Sarah L.W. Sutherland for Plaintiff and Respondent.

California law requires school districts to expel a student in a limited set of circumstances, including, for instance, when the student furnishes a firearm, brandishes a knife at another person, or possesses an explosive. State law also grants school districts discretion to expel a student if they make two findings. First, the school district must find the student committed one of several statutorily enumerated acts, including, as relevant here, that the student possessed a dangerous object or an imitation firearm. Second, the school district must find either (1) "[o]ther means of correction are not feasible or have repeatedly failed to bring about proper conduct" or (2) "[d]ue to the nature of the act [or

2

violation], the presence of the pupil causes a continuing danger to the physical safety of the pupil or others." (Ed. Code,[1] § 48915, subd. (b); see *id.*, subd. (e).)

In this case, Natomas Unified School District (the District) expelled a student, I.O., under its discretionary authority. At an expulsion hearing, the District heard evidence that I.O. brought two unloaded BB guns and a sealed bag of plastic BBs to his middle school, showed the guns to two friends, and fired one of the unloaded guns at the ground. The District also heard evidence that one of the friends who saw the guns feared testifying at the expulsion hearing because I.O. and his mother had asked the student's family to speak about I.O.'s character. Based on this evidence, the District found I.O. unlawfully intimidated a witness. It further found he should be expelled. It reasoned that he committed an expellable offense in possessing the BB guns and posed a continuing danger to himself or others—a conclusion it reached after preventing I.O. from presenting character witnesses and excluding his evidence tending to show his classmates did not believe he posed a danger.

On I.O.'s appeal from the trial court's judgment in the District's favor, we reverse for two reasons. First, we find the District's "continuing danger" finding was flawed. In the District's view, it could consider only I.O.'s immediate misconduct when evaluating whether he posed a continuing danger to himself or others. But under the relevant standard, the District should have considered all the relevant facts, including evidence of I.O.'s general character. Because the District misunderstood the appropriate inquiry, it improperly limited I.O.'s ability to present a defense and excluded relevant evidence. Second, we find the District's witness intimidation finding was flawed. To support a claim of witness intimidation in a school disciplinary proceeding, the evidence must show the student either intended to prevent another student from testifying or to retaliate

---

[1] Undesignated statutory references are to the Education Code.

against another student for testifying. But no evidence in this case shows I.O. had any improper intent. For these reasons, we reverse.

BACKGROUND

I

*Legal Background*

Children in California have a right to a public school education. (*Levi v. O'Connell* (2006) 144 Cal.App.4th 700, 707; see also Cal. Const., art IX, § 5 ["The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district . . . ."].) But this right is not absolute. Section 48900 et seq. describes the grounds and procedures for expelling a student—the most serious form of student discipline. (See § 48925, subd. (b) [" 'Expulsion' means removal of a pupil from (1) the immediate supervision and control, or (2) the general supervision, of school personnel . . . ."].)

Under these provisions, the expulsion process begins with a school's principal or a school district's superintendent recommending expulsion for one of the grounds listed in section 48900 et seq. (§§ 48900, 48915, subds. (a)(1), (b), (c), (e).) Three of these grounds, two of which are largely identical, are relevant here. First, a principal or superintendent generally must recommend a student's expulsion if the student possessed "any . . . dangerous object of no reasonable use to the pupil." (§ 48915, subd. (a)(1)(B).) Second, a principal or superintendent may recommend a student's expulsion if the student "[p]ossessed, sold, or otherwise furnished a . . . dangerous object" without school permission. (§ 48900, subd. (b).) And third, a principal or superintendent may recommend a student's expulsion if the student "[p]ossessed an imitation firearm" — meaning, "a replica of a firearm that is so substantially similar in physical properties to an existing firearm as to lead a reasonable person to conclude that the replica is a firearm." (*Id.*, subd. (m).)

4

Should a principal or superintendent recommend a student's expulsion, the school district must then schedule a hearing on the proposed expulsion. (§ 48918, subd. (a)(1).) The district must also, at least 10 days before the hearing, notify the student of the time and place of the hearing (*id.*, subd. (b)(1)), provide a "statement of the specific facts and charges upon which the proposed expulsion is based" (*id.*, subd. (b)(2)), and, among other things, inform the student of the student's right "to confront and question all witnesses who testify at the hearing, to question all other evidence presented, and to present oral and documentary evidence on the pupil's behalf, including witnesses" (*id.*, subd. (b)(5)).

Following a hearing on a student's proposed expulsion, the school district's governing board must decide whether to expel the student, with the required findings varying depending on the charges. (§ 48918, subd. (a)(2).) If a principal or superintendent recommends a student's expulsion for possessing a dangerous object (§§ 48915, subd. (a)(1)(B), 48900, subd. (b)), the school district's governing board may order expulsion if it makes two findings. First, it must find the student committed the alleged act. Second, it must find "one or both of the following": (1) "[o]ther means of correction are not feasible or have repeatedly failed to bring about proper conduct," or (2) "[d]ue to the nature of the act, the presence of the pupil causes a continuing danger to the physical safety of the pupil or others." (§ 48915, subd. (b).) Similarly, if a principal recommended a student's expulsion for possessing an imitation firearm (§ 48900, subd. (m)), the school district's governing board may order expulsion if it makes two findings. First, it must find the student committed the alleged act. Second, it must find "either of the following": (1) "[o]ther means of correction are not feasible or have repeatedly failed to bring about proper conduct," or (2) "[d]ue to the nature of the violation, the presence of the pupil causes a continuing danger to the physical safety of the pupil or others." (§ 48915, subd. (e).)

II

*Factual Background*

A.      *I.O. Brings Two BB Guns to His School*

I.O. formerly attended a middle school in the District.  On two consecutive days in 2019, when he was 11 years old, he brought two plastic BB guns and a sealed bag of plastic BBs to his middle school.  Both guns were unloaded and had orange tips.  I.O. kept the guns in his backpack during school hours and showed them to two friends after school.

On the first day, I.O. told his friends he had a "gun" and revealed part of one of the BB guns while off school property.  But after some giggling, he admitted the gun was fake and revealed its orange tip.  According to his friends' unsworn statements, the friends told him not to bring the guns again.  The next day, I.O. brought the guns again and again showed them to his friends—this time on school property at one of the school's exits.  I.O. then pulled one of the unloaded guns out of his bag, pointed it at the ground, and fired it.  A parent noticed and walked over to I.O.  The parent seized I.O.'s bag, instructed him to wait, and directed another parent to get the principal, Amy Whitten.

Whitten arrived shortly afterward, finding I.O. crying.  I.O. told her, "[T]his man scared me[.]  I was just going to take it to the park[.]  I want to be a police officer."  I.O. added he was sorry.  Mia Emmitt, a retired police officer and substitute teacher, arrived soon after and walked with Whitten and I.O. to Whitten's office.  After reaching Whitten's office, Emmitt and Whitten searched I.O.'s bag and found two unloaded BB guns and a sealed pack of BBs.  A school resource officer afterward conducted a threat assessment.  He found two unloaded BB guns and no credible threat.

B.      *The District Expels I.O.*

Whitten recommended that the District expel I.O., citing sections 48915, subdivision (a)(1) and 48900, subdivisions (b), (k), and (m).  As covered above, with the exception of section 48900, subdivision (k), these provisions either require or authorize a

6

principal to recommend expulsion if a student possessed a dangerous object (§§ 48915, subd. (a)(1), 48900, subd. (b)) or an imitation firearm (§ 48900, subd. (m)). Section 48900, subdivision (k), in turn, authorizes a principal to suspend, but not expel, certain students for disrupting school activities or willfully defying school personnel. (§ 48900, subd. (k)(1)-(4).)

Following Whitten's recommendation, I.O.'s parents requested a hearing to determine whether expulsion would be appropriate. The District then scheduled a hearing before a three-member panel, consisting of two principals and a vice principal from other schools in the District. (See § 48918, subd. (d) [a school district's governing board can appoint an impartial three-person panel to conduct an expulsion hearing].) Dr. Michelle Hamilton, a District director who was not part of the panel, designated herself the "panel chairperson." Whitten appeared on the middle school's behalf, and I.O. and his parents appeared on I.O.'s behalf.

To make its case in favor of expulsion, the school relied largely on unsworn written statements from two parents and two students. One parent said he saw a student with a gun, and another parent said she notified Whitten after hearing about the gun. The two students discussed seeing the BB guns. One said, I.O. "told me an[d] [redacted] that he had a gun. [Redacted] and I told him no[t] to bring it. He told us it was just a BB gun. The next day he took it out and [redacted] dad saw him." The student added that the students were walking home the first day and at school the second day. The other student said, I.O. "blurted out that he had a gun on our way back home. I got suspi[ci]ous of him cause he was giggling so I asked him to show me the tip of the gun so I could make sure if it was a real gun. I wanted to see it because I knew the difference between a bee-bi gun and a real gun. After [I] said that[,] he told us it was a bee-bi gun." The student added that the next day, I.O. "pulled out the gun and shot at the ground (the gun had no bee bi's in it)."

7

Apart from the witness statements, the school presented two witnesses at the hearing: Whitten and Emmitt. Before the hearing, Emmitt submitted an unsworn statement characterizing the BB guns as "very realistic looking, albeit fake handguns." But at the hearing, after swearing an oath to tell the truth, she said the guns "were real small, real fake looking." She also discussed her efforts to determine I.O.'s motive for bringing the guns. I.O. told her he wanted to become a police officer after hearing from an officer at a recent career day and so decided "to take these little BB guns to the park and shoot them at trees to maybe practice." He also told her he brought the guns to school because that would allow him to go directly to the park for practice after school on his way home. Emmitt found I.O. "completely genuine," though a little ignorant. In her view, "he was just a little boy that wanted to go practice." She added that she had no "safety concern at all" after considering I.O.'s demeanor, found "this [wa]s probably a stupid mistake," and believed I.O. should not be expelled.

Whitten spoke next.[2] Apart from reading an incident report and the witness statements, her statements largely touched on a new charge against I.O. that had yet to be mentioned to I.O. and his family—intimidating a witness in violation of section 48900, subdivision (o). Under that provision, a student cannot "harass[], threaten[], or intimidate[] a pupil who is a complaining witness or a witness in a school disciplinary proceeding for purposes of either preventing that pupil from being a witness or retaliating against that pupil for being a witness, or both." (§ 48900, subd. (o).)

To establish the new charge, Whitten said she earlier spoke to a parent of one of the students who saw the BB guns. In Whitten's retelling, the parent said I.O.'s family visited her home and asked her and her family to speak on I.O.'s behalf at the hearing.

---

[2] The parties dispute whether Whitten swore to tell the truth at the hearing. Nothing in the administrative record shows she did. But in the trial court, Whitten submitted a declaration indicating she did testify under oath.

8

But the family felt uncomfortable with the visit and declined to show up at the hearing. Apart from relaying the parent's statements, Whitten and a panel member also discussed the parent's and her son's written statements about these events. In these statements, both the parent and the son checked a box requesting that their "statement remain anonymous as I fear retaliation. Following are the specific reasons." The student wrote: I.O. "and his mom came to my house and started talking to my mom about the statement." The parent, similarly, wrote: "I really don't want to attend this hearing because boy [and] his mom came to our house, and want me to write statement. But I really don't know about this boy. And I am scare[d] to show them our faces who we are."

After hearing these statements, I.O.'s mother tried to explain. She said, "I did not request the parent to speak on [I.O.'s] behalf. I only asked for a letter of character reference because [I.O.] knows them" and "walks home with that family every day from school." But a panel member found her explanation lacking. He said even if I.O.'s mother had no intent to intimidate, "when someone now says that they're scared to come here and show their face or be involved in this, that is -- that is why this is -- this Ed Code is in place." He then admonished her: "It's not appropriate to . . . intervene in a hearing like this or process like this by going to someone's house."

Following the admonishment, Dr. Hamilton allowed I.O.'s parents to present their son's side of the case. I.O.'s parents intended to question one of his teachers at the hearing and, to that end, asked the school to bring the teacher to the hearing. I.O.'s parents believed the teacher—who recently wrote that I.O. "is very patient and caring to his classmates," "is a cheerful, pol[ite], and enthusiastic learner," and "is a positive influence on the class and a joy to have in class"—would provide a fuller picture of I.O. because she interacted with I.O. on a daily basis. But the school declined to produce the teacher at the hearing. Dr. Hamilton attempted to provide an explanation on the record, but the record captured only this: "[W]e don't (unintelligible)." The District later

9

acknowledged that off the record it informed I.O.'s parents that the teacher could not testify because "[i]nformation regarding [I.O.'s] general character was not probative. . . ."**3**

I.O.'s parents also sought to present a family member, who was a parole officer, as a witness who could testify about the BB guns and I.O.'s character. But a District director refused to allow the family member to testify because he did not witness the incident. I.O.'s mother further discussed various student comments (20 in her count) telling him "we miss you," "we want you back," "everyone has your back and supports you," and "everyone makes mistakes, you are not a bad person." She also brought copies of the comments. But the panel never admitted these comments into the record. The District later indicated it found this type of evidence irrelevant because it "was not probative of the conduct in question or whether due to the nature of it, [I.O.'s] presence at school caused [a]n ongoing danger."

With limited witness options, I.O.'s parents relied principally on one witness: I.O. I.O. acknowledged he took the BB guns to school on two days, took a gun out of his backpack on one occasion, and shot the gun at the ground. He said he wanted to "show my friends" and to do "target practice after school." He added that he had just received the BB guns and had never before shot a BB gun, apart from the one instance when he fired the unloaded gun at the ground. He acknowledged it was wrong to bring the BB guns to school.

Following the hearing, the panel recommended that I.O. receive a suspended expulsion. It cited the same statutes that Whitten had cited in her expulsion

---

**3** Although the District claimed character evidence was inadmissible, it only appears to have excluded evidence of good character. To the extent the District found evidence of bad character (including evidence showing I.O. had a prior incident with another student that resulted in peer mediation), the District admitted the evidence.

10

recommendation and added a new statute, section 48900, subdivision (o), for the witness intimidation charge. It also checked a box stating, "Due to the nature of the act, the presence of the pupil causes a continuing danger to the physical safety of the pupil or others." Explaining its decision, the panel wrote that I.O. admitted possessing two BB guns and an unopened pack of BBs, shooting an unloaded BB gun, and trying to pass the guns as real. But citing I.O.'s age and "minimal behavior history," the panel recommended a suspended expulsion, which would allow I.O. to continue to receive work from his teacher for the remainder of the semester and then enroll in the Promise Program—a community school for expelled students—for the following semester. Although the panel left open the possibility that I.O. could eventually return to a school in the District if certain conditions were met, it found he should never return to his current middle school because he had intimidated a witness.

The District's governing board later adopted the panel's findings and the panel's suspended expulsion order without modification.

C.  *The County Board's Decision*

I.O. appealed the District's decision to the Sacramento County Board of Education (the County Board), which, per section 48922, has authority to review a school district's expulsion decisions. Under its review authority, the County Board may evaluate, among other things, whether a school district provided a fair hearing, abused its discretion, or improperly excluded relevant and material evidence. (§ 48922, subd. (a)(2)-(4).)

After holding a hearing, the County Board reversed the District's decision. It found the District deprived I.O. of a fair hearing and prejudicially abused its discretion for several reasons. First, it found insufficient evidence supported the District's findings that I.O. possessed a "firearm," a "dangerous object," and an "imitation firearm." Second, it found insufficient evidence supported the District's finding that I.O. posed a continuing danger and further found the District improperly excluded evidence— including his teacher's testimony and his classmates' comments—that could have been

11

relevant to this topic. Third, it found the District wrongly relied on section 48900, subdivision (k) as a ground for expulsion. Fourth, it found the District's finding that I.O. intimidated a witness failed for two reasons—the District provided inadequate notice of the charge, and it also supplied insufficient evidence to support a finding of witness intimidation. Lastly, the County Board found the District failed to provide I.O. with a fair hearing, reasoning that the District prejudicially undermined I.O.'s right to present evidence and question witnesses and that Dr. Hamilton, a high-level District administrator, improperly influenced the hearing panel when she advocated for I.O.'s expulsion.

The County Board ordered the District's expulsion decision expunged from I.O.'s school records and deemed the expulsion not to have occurred.

D.     *The Trial Court's Decision*

Following the County Board's decision, the District filed a combined petition for writ of administrative mandamus and civil complaint for declaratory and injunctive relief with the trial court. The District asked the trial court to order the County Board to set aside its decision, to declare that the County Board acted in excess of its authority, and to enjoin the County Board. It also sought an immediate stay of the County Board's decision to prevent I.O. from enrolling at his middle school before a decision on the merits.

A trial judge with Sacramento County Superior Court denied the District's request for an immediate stay. The court explained, based on the limited evidence before it, that it "disagree[d] with the district that the board . . . appears to have exceeded its authority in overturning the decision. I don't believe they've exceeded their authority." The court added that "none of the evidence that the school district has presented . . . indicates that the student poses any continuing danger to school safety."

Following the adverse ruling, the District sought an order assigning the case to a judge from a different court. It reasoned that because the suit involved two adversarial

12

public entities from Sacramento County, the matter should be before a judge from a county other than Sacramento County.  (See Code Civ. Proc., § 394.)  The court granted the motion and, shortly after, the case was reassigned to a trial judge with Placer County Superior Court.

After the reassignment, the trial court found the County Board's decision should be set aside, finding none of the County Board's stated reasons for its decision persuasive.  The court afterward ordered the County Board to set aside its decision and, after finding the District's suit enforced an important public policy, awarded the District over $150,000 in attorney fees.

I.O. and the County Board appealed.[4]

## DISCUSSION

### I

### *Timeliness of Appeal*

We start with the District's contention that I.O. and the County Board filed their appeals too late.  Although the trial court purported to enter judgment on January 4, 2021, in a document titled "Judgment Granting Peremptory Writ of Mandate" (the Judgment), the District contends the court actually entered judgment on October 2, 2020, in a document titled "Ruling on Petition for Writ of Administrative Mandamus" (the Ruling). It then contends I.O.'s and the County Board's appeals are untimely because they filed their appeals on January 26, 2021, and March 2, 2021, respectively, more than 60 days after the trial court clerk served them with the Ruling on October 2, 2020.  We disagree.

The normal time for filing an appeal is the earlier of "(A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled

---

[4] Various parties submitted applications to file briefs as amicus curiae.  We granted several of these applications before oral argument.  We grant two more here, one for Mary Louise Frampton and another for Former School District Superintendents.

13

'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served; [¶] (B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, accompanied by proof of service; or [¶] (C) 180 days after entry of judgment." (Cal. Rules of Court, rule 8.104(a)(1).) The District focuses on the first of these timelines. It argues the trial court's October 2020 Ruling, and not its January 2021 Judgment, served as the court's judgment. It then contends the 60-day timeline for filing an appeal was triggered in October 2020 when the trial court clerk served the parties with a filed-endorsed copy of the Ruling.

But in making this argument, the District both misstates the facts concerning the service of the Ruling and misunderstands the law on judgments. We start with the facts. Although the District claims the Ruling was served on all parties, the proof of service shows it was served on only two parties: the County Board and the District. I.O. was never served. So even if we accept that the Ruling was the court's judgment, I.O.'s appeal nonetheless remains timely. That is because a party, having never been served with the judgment, has 180 days after entry of judgment to file an appeal (Cal. Rules of Court, rule 8.104(a)(1)); and in this case, I.O. filed his appeal on March 2, 2021, less than 180 days after entry of the Ruling.

We turn next to the law. "An application for a writ of administrative mandamus," like the one the District filed here, "is a 'special proceeding of a civil nature.'" (*Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1115 (*Dhillon*).) A "judgment" in these types of proceedings "is the final determination of the rights of the parties therein" (Code Civ. Proc., § 1064), and it does one of two things: It "either command[s] respondent to set aside the [challenged] order or decision, or den[ies] the writ" (*id.*, § 1094.5, subd. (f); see also *ibid.* ["Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case . . . and may order respondent to take such further action" as required by law]).

14

But the October 2020 Ruling neither finally determined the rights of the parties nor commanded the County Board to set aside its decision. Although the court said the County Board's "decisions . . . are set aside" in the Ruling, it did not in fact command the County Board to set aside its decision until the January 2021 Judgment. Nor did it specify the full relief the District would ultimately receive, which led the parties to further disputes over the appropriate terms for the judgment. As the District itself acknowledged in a letter to the trial court at the time, the District and the County Board could not settle on the terms of the proposed judgment following the court's Ruling and sought a hearing to resolve their dispute. After the District proposed various versions of the judgment, the trial court finally entered the Judgment in January 2021.

Considering these circumstances, we cannot say the October 2020 Ruling was "the final determination of the rights of the parties" (Code Civ. Proc., § 1064) that "either command[ed] respondent to set aside the order or decision, or den[ied] the writ" (*id.*, § 1094.5, subd. (f)). The court's January 2021 Judgment instead served that function. It provided for "judgment granting the petition . . . in favor of [the District]" and provided for the issuance of the requested writ of mandate that commanded the County Board to set aside its decision, to act consistent with the Ruling, and to file a return to the writ within 60 days. With the Judgment, and not the earlier Ruling, the trial court finally terminated the litigation between the parties on the merits of the case. (See *Dhillon*, *supra*, 2 Cal.5th at p. 1115 ["a judgment is final, and therefore appealable, ' " 'when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined' " ' "].)

The District's counterarguments do not persuade us to find otherwise. It first contends "an order granting . . . a petition for an extraordinary writ constitutes a final judgment for purposes of an appeal, even if the order is not accompanied by a separate formal judgment." We acknowledge that several courts have stated as much. (See *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409;

15

*Meinhardt v. City of Sunnyvale* (2022) 76 Cal.App.5th 43, 58, review granted June 15, 2022, S274147.) But we find these cases misstate the relevant law. As our Supreme Court has explained, "cases have . . . held that a trial court's judgment granting administrative mandamus, *and ordering the substantive relief sought by the petitioner*, is a final judgment." (*Dhillon*, *supra*, 2 Cal.5th at pp. 1113-1114, italics added.) And as our Supreme Court has further explained, "[a]s a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final." (*Id.* at p. 1115.) For the reasons already covered, the trial court's Ruling was not a final judgment under this standard. It neither ordered the full substantive relief that the District sought—including the District's requested "[j]udgment ordering the [County Board] to set aside the Decision"—nor resolved all issues except the fact of compliance or noncompliance.

The District next suggests the trial court clerk evinced its own understanding that the Ruling served as the judgment. That is so, it reasons, because "[w]hen the Court filed its October 2, 2020, Ruling . . ., the Court [clerk] immediately entered judgment on the same day in the court record, as reflected in the Court's Register of Actions." (Italics omitted.) But the register of actions does not refer to any judgment until January 4, 2021, when the court entered the January 2021 Judgment. That indicates that the court clerk understood the January 2021 Judgment, and not the earlier Ruling, to be the judgment. In any event, the substance and effect of a decision, not the clerk's offered label in the register of actions, is the controlling consideration. (See *Dhillon*, *supra*, 2 Cal.5th at p. 1115 [" ' "It is not the form of the decree but the substance and effect of the adjudication which is determinative" ' "].)

Lastly, the District contends the Ruling granted it the exact relief it sought and left no issue open for future consideration except the fact of compliance or noncompliance. It then characterizes the January 2021 Judgment as merely "redundant" of the earlier

16

Ruling. But that is not quite true. In the Ruling, the court explained its reasoning for rejecting the County Board's decision, said the writ was granted, and said the County Board's decisions are set aside. But it did not actually grant the District the full relief it sought, nor did it command the County Board to do anything, until the January 2021 Judgment. Only then did the court provide for "judgment granting the petition . . . in favor of [the District]" and provide for the issuance of a writ of mandate commanding the County Board to set aside its decision. The District's conduct before the trial court, moreover, undermines its current claim that the January 2021 Judgment was merely redundant of the Ruling. Again, following the Ruling, the District negotiated with the County Board on the terms of the proposed judgment and sought a hearing to resolve the parties' disputes. These prior efforts to obtain a judgment in its favor bely the District's current assertion that the Ruling itself already resolved all the parties' disputes. (See *Davis v. Superior Court* (2011) 196 Cal.App.4th 669, 673 ["The city's filing of its '[Proposed] Judgment' belies its assertion that nothing more needed to be done, for if nothing more were needed then why did the city file its proposed judgment"].)

II

*The District's "Continuing Danger" Finding*

Satisfied we have jurisdiction, we turn to I.O.'s and the County Board's contention that the District misinterpreted section 48915 when it concluded I.O. posed a continuing danger. I.O. contends the District, believing "the only relevant evidence on this issue concern[ed] the incident itself," improperly excluded relevant evidence and failed to consider whether he truly posed a continuing danger. The County Board argues similarly. We agree the District relied on a flawed understanding of section 48915.

Under section 48915, again, the District needed to make two findings before expelling I.O. First, it had to find he committed an offense that could warrant expulsion; and second, it had to find one or both of the following: (1) "[o]ther means of correction are not feasible or have repeatedly failed to bring about proper conduct," or (2) "[d]ue to

17

the nature of the act [or violation], the presence of the pupil causes a continuing danger to the physical safety of the pupil or others." (§ 48915, subd. (b); see *id.*, subd. (e).) The parties refer to the first required finding as the "primary" finding and the second as the "secondary" finding.

Our focus here is on the "continuing danger" provision, which the District relied on for its secondary finding. According to the District, the statutory text shows it could consider only the nature of I.O.'s misconduct when evaluating whether he posed a continuing danger. That is so, it argues, because the relevant inquiry under section 48915 is whether the student poses a continuing danger "due to" the nature of the student's misconduct—which the District presumes to mean due *only* to the nature of the student's misconduct.[5]

But according to I.O., the County Board, and the Attorney General (as amicus curiae), a school district must consider a student's circumstances more broadly before finding the student poses a continuing danger. I.O. reasons that "[e]ven considering only 'the nature of the act' under section 48915[, subdivision ](b)(2), the *context* of the act is important" and "[t]hat context includes the student's character." The County Board appears to reason similarly. The Attorney General, taking a different approach, reasons that the "continuing danger" provision requires school districts to engage in a "two-part inquiry" that separately considers the nature of the act and the danger the student poses.

---

[5] The District adds that its interpretation is entitled to deference under *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1—a case that dealt with a state agency's interpretation of a state law it was charged with enforcing. (*Id.* at pp. 6-8.) But as other courts have found, while it often makes sense to give deference to a state agency's interpretation of a state statute, it makes less sense to defer to a local agency's interpretation of a state statute when numerous local agencies are charged with applying the same statute. (*California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 501; see also *Purifoy v. Howell* (2010) 183 Cal.App.4th 166, 182-183.)

Our reading of section 48915 largely aligns with I.O.'s, the County Board's, and the Attorney General's reading, though our reasoning is different than their own. Familiar principles of statutory interpretation guide our decision. " ' " 'We first examine the statutory language, giving it a plain and commonsense meaning' " ' " in an effort to ascertain the Legislature's intent. (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673.) We also " ' " 'consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " (*Ibid.*) " ' " 'If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " ' " (*Ibid.*)

Those principles in mind, we turn first to section 48915's text—and in particular, to the phrase "[d]ue to the nature of the act [or violation]." (§ 48915, subd. (b); see *id.*, subd. (e).) Although the phrase "due to" demonstrates that there must be a causal connection between "the nature of the act [or violation]" and a finding of continuing danger, "the closeness of the causal connection" is less clear. (*U.S. Postal Service v. Postal Regulatory Com'n* (D.C. Cir. 2011) 640 F.3d 1263, 1268.) As other courts have observed, "[t]he phrase 'due to' is ambiguous. 'The words do not speak clearly and unambiguously for themselves. The causal nexus of "due to" has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other.' " (*Ibid.*) "In other words, the phrase can mean 'due *in part* to' as well as 'due *only* to.' " (*Ibid.*; see also *Kimber v. Thiokol Corp.* (10th Cir. 1999) 196 F.3d 1092, 1100 ["The phrase 'due to' is ambiguous"]; *Adams v. Director, OWCP* (6th Cir. 1989) 886 F.2d 818, 821 [describing the "obvious ambiguity in the 'due to' language"].)

Considering the phrase "due to" in the context of section 48915, we find the phrase means "due in part to"—which means the "continuing danger" finding must be due in part to, not due solely to, "the nature of the act [or violation]." (§ 48915, subd. (b); see *id.*, subd. (e).) Our construction of the statute is grounded largely in a commonsense reading of the text. Under section 48915, subdivisions (b)(2) and (e)(2), the ultimate question is whether "the presence of the pupil causes a continuing danger." (*Id.*, subds. (b), (e).) And as a matter of commonsense, determining whether a child truly poses a continuing danger favors consideration of all the relevant facts, including evidence of the child's character. (Cf. *United States v. Schell* (10th Cir. 1982) 692 F.2d 672, 675 [court could consider character evidence, prior conduct, and prior convictions in evaluating a defendant's dangerousness]; *Boyd v. Johnson* (5th Cir. 1999) 167 F.3d 907, 912 ["Evidence of good character . . . may support a negative answer to the special issue regarding the future dangerousness"].) Between the parties' competing interpretations, then—one requiring a school district to make a finding of dangerousness based only on a slice of information (namely, the nature of the student's misconduct), and one requiring a school district to make a finding of dangerousness based on all the relevant facts—we find the latter interpretation "more ' "compatible with common sense." ' " (*People v. Raybon* (2021) 11 Cal.5th 1056, 1069 [between two proposed interpretations, courts favor the one more compatible with commonsense].)

We also find this interpretation compatible with the whole of the statute, even if it results in the "[d]ue to the nature of the act [or violation]" language playing a different role than the District prefers. Like the District, we agree this language is important. It ensures, for instance, that a school board does not find a student poses a continuing danger for reasons having no meaningful connection to "the nature of the act [or violation]" that led to the recommended expulsion. But we find it does not, as the District believes, bar a school district from considering matters apart from the nature of the act or violation when evaluating whether a student poses a continuing danger. Again,

20

as between one interpretation requiring a school district to make a finding of dangerousness based on a single moment in a child's life, and another interpretation requiring a school district to make a finding of dangerousness based on all the relevant facts, we find the latter interpretation more sensible and consistent with the Legislature's likely intent.

Review of the overall statutory scheme reinforces our reading of section 48915. Various provisions in section 48900 et seq. require school districts to evaluate whether a student poses a danger. We discussed two of these provisions already with section 48915, subdivisions (b) and (e). Several other provisions are similar, though they omit the "[d]ue to the nature of the act [or violation]" language. Section 48900.5, subdivision (a), for instance, allows a school district to suspend a student for certain first-time offenses when "the pupil's presence causes a danger to persons." Section 48911, subdivision (g), as another example, allows a school district to extend a suspension while awaiting an expulsion decision if "the presence of the pupil at the school or in an alternative school placement would cause a danger to persons or property or a threat of disrupting the instructional process." And section 48916, subdivision (c), to offer one last example, requires a school district to readmit an expelled student who has completed the district's readmission process, "unless the governing board makes a finding that the pupil has not met the conditions of the rehabilitation plan or continues to pose a danger to campus safety or to other pupils or employees of the school district." (See also 48911.1, subd. (a), 48915.1, subd. (c), 48915.2, subd. (b).)

All these other provisions require a school district to evaluate whether a student poses a danger based on all the relevant facts without any explicit limit on the scope of the district's inquiry. And if the Legislature intended a broad inquiry to evaluate dangerousness in these provisions, we find it odd to conclude that it intended a far narrower inquiry in section 48915, subdivisions (b) and (e). A simple example emphasizes the point. Under the District's reading, a school district would evaluate the

21

child's true dangerousness based on all the relevant facts when deciding whether to extend a suspension while awaiting an expulsion decision (see § 48911, subd. (g)), but it would then artificially evaluate dangerousness based on a single piece of information when deciding whether to expel. We find it highly unlikely that the Legislature intended an informed finding of dangerousness for the initial decision to suspend but a largely uninformed finding of dangerousness for the ultimate decision to expel. A more sensible reading is that the Legislature intended a similar approach in all these provisions—it wanted school districts to evaluate whether the student truly poses a danger based on all the relevant facts, even if, in some instances, it also wanted school districts to ensure that the dangerousness finding had a meaningful connection to "the nature of" the student's immediate misconduct.

We further find this construction consistent with the Legislature's general intent in section 48900 et seq. In a preamble to a 2012 amendment to section 48900 set seq., the Legislature made at least four findings and declarations about this scheme that are relevant here. It declared: "The public policy of this state is to ensure that school discipline policies and practices support the creation of safe, positive, supportive, and equitable school environments where pupils can learn." (Stats. 2012, ch. 425, § 1, subd. (a).) It found: "The overuse of school suspension and expulsion undermines the public policy of this state and does not result in safer school environments or improved pupil behavior. Moreover, such highly punitive, exclusionary practices are associated with lower academic achievement, lower graduation rates, and a worse overall school climate." (*Id*., subd. (b).) It further found: "Research has found that nonpunitive classroom discipline and in-school discipline strategies are more effective and efficient than suspension and expulsion for addressing the majority of pupil misconduct." (*Id*., subd. (f).) And it declared: "The public policy of this state is to provide effective interventions for pupils who engage in acts of problematic behavior to help them change their behavior and avoid exclusion from school." (*Id*., subd. (g).)

22

These findings together demonstrate that although school districts must have the ability to suspend and expel students, they should only do so when appropriate to promote safer school environments and improve pupil behavior. And in evaluating whether expulsion promotes the goal of safer school environments, commonsense favors a scheme that evaluates the student's actual dangerousness based on all the relevant facts, not a scheme that artificially evaluates dangerousness based solely on a single moment in time. The former approach, not the latter, better aligns with the Legislature's intent to promote safe school environments while also limiting unnecessary expulsions.

For all these reasons—section 48915's text, the broader statutory scheme for expulsions, and the Legislature's declared intent for this scheme—we find the "continuing danger" provisions in section 48915, subdivisions (b) and (e) require consideration of all the relevant facts, not merely the facts concerning "the nature of the act" (§ 48915, subd. (b)) or "the nature of the violation" (*id.*, subd. (e)). In some cases, following this approach may lead a school district to find a student poses a continuing danger, even if it might have found otherwise had it considered only "the nature of the act [or violation]" itself. But in other cases, consideration of all the relevant facts may militate against a finding that a student poses a continuing danger, as I.O. argues in this case.

Here, in declining to consider all the relevant facts, the District misconstrued section 48915's "continuing danger" provisions and prejudicially abused its discretion as a result. Because the District misinterpreted the statute, it improperly declined to admit or consider relevant and material evidence that I.O. sought to produce, including his teacher's testimony, his teacher's positive feedback, and his classmates' supportive comments. Shortly before I.O. brought the BB guns to school, his teacher had written that I.O. "is very patient and caring to his classmates," "is a cheerful, pol[ite], and enthusiastic learner," and "is a positive influence on the class and a joy to have in class."

23

Several classmates, in turn, wrote "we miss you," "we want you back," "everyone has your back and supports you," and "everyone makes mistakes, you are not a bad person."

All this evidence tended to show that those at school who knew I.O. best—his teacher and his classmates—did not believe he posed a danger to the physical safety of himself or others. Yet the District, misreading section 48915, found this evidence irrelevant, precluded I.O.'s teacher from testifying, and failed to conduct the appropriate inquiry under section 48915. Under these circumstances, we conclude the County Board properly found the District prejudicially abused its discretion. (See § 48922, subd. (c)(1) [a school district abuses its discretion "[i]f school officials have not met the procedural requirements" of § 48900 et seq.].)

### III

*The District's Witness Intimidation Finding*

Lastly, we consider I.O.'s and the County Board's challenge to the District's finding that I.O. intimated a witness in violation of section 48900, subdivision (o). Both I.O. and the County Board contend insufficient evidence supports the District's finding. I.O. also contends the District pursued this charge not because the evidence warranted it, but because the District sought to retaliate against I.O. and his mother for attempting to prepare a defense. We agree the witness intimidation finding lacks evidentiary support.

Section 48900, subdivision (o) allows a school to discipline a student who "[h]arassed, threatened, or intimidated a pupil who is a complaining witness or a witness in a school disciplinary proceeding for purposes of either preventing that pupil from being a witness or retaliating against that pupil for being a witness, or both."

Here, in finding I.O. violated this provision, the District relied on two written statements—one from a fellow student and another from the student's mother. Both the student and his mother sought to avoid testifying at I.O.'s hearing and, after receiving a pre-filled form, checked a box saying they feared retaliation. The student wrote: I.O. "and his mom came to my house and started talking to my mom about the statement."

24

The student's mother, similarly, wrote: "I really don't want to attend this hearing because boy [and] his mom came to our house, and want me to write statement. But I really don't know about this boy. And I am scare[d] to show them our faces who we are." Based on this evidence, the panel found I.O. intimated a witness within the meaning of section 48900, subdivision (o). Although one panel member acknowledged I.O. and his mother might not have had any ill intent, he found that irrelevant; it was enough, in his view, that "someone now says that they're scared to come here and show their face or be involved in this." The District later adopted the panel's finding without modifications.

We conclude the District's finding lacks evidentiary support. Again, section 48900, subdivision (o) allows a school to punish a student who "[h]arasse[s], threaten[s], or intimidate[s] a pupil . . . *for purposes of either preventing that pupil from being a witness or retaliating against that pupil for being a witness, or both*." (Italics added.) As the statutory text makes clear, the student's intent matters. But here, we have no evidence that I.O. had the requisite improper intent. The student and his parent may have feared retaliation, as evidenced by their checking a box saying, "I request my statement remain anonymous as I fear retaliation." But they never alleged facts tending to show that I.O. "[h]arassed, threatened, or intimidated a pupil . . . for purposes of . . . retaliating against that pupil for being a witness." (§ 48900, subd. (o).) Even the one panel member who commented on the topic acknowledged that I.O. and his mother might not have had any improper intent.

The District, believing the evidence sufficient, counters that it is enough that I.O.'s friend and his mother "felt intimidated by [I.O.'s] mother's actions to the point that they were fearful of the consequences of testifying at the hearing." (Italics omitted.) But the District misconstrues section 48900, subdivision (o) on several levels. First, in focusing on I.O.'s mother's actions, the District evidently believes I.O. could be punished for the conduct of his parents. But section 48900 is explicitly concerned with the student's

25

conduct, not the conduct of any parent. (§ 48900 [authorizing punishment if is "determine[d] that the *pupil* has committed an act as defined pursuant to any of subdivisions (a) to (r)" (italics added)].) Second, the District fails to appreciate that section 48900, subdivision (o) is a specific intent offense. Again, per that provision, I.O. needed to "[h]arass[], threaten[], or intimidate[] a pupil . . . for purposes of either preventing that pupil from being a witness or retaliating against that pupil for being a witness, or both." (§ 48900, subd. (o).) But as covered, we have no evidence of the required ill intent.[6]

---

[6] Because we find reversal appropriate for the reasons stated, we need not address I.O.'s and the County Board's alternative arguments for reversal. Those arguments include that the trial court applied the wrong standard of review, the District improperly relied on hearsay evidence and unsworn statements, the District's conclusions that I.O. possessed a dangerous object and an imitation firearm were not supported by sufficient evidence, the District's conclusion that I.O. posed a continuing danger was not supported by sufficient evidence, the District failed to identify findings supporting its "continuing danger" conclusion, the District deprived I.O. of a fair hearing, the District failed to provide sufficient notice of the witness intimidation charge, and the trial court improperly awarded attorney fees.

26

DISPOSITION

The judgment and the postjudgment order granting attorney fees are reversed. I.O. and the County Board are entitled to recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

/s/
_____
BOULWARE EURIE, J.

We concur:


/s/
_____
ROBIE, Acting P. J.


/s/
_____
HOCH, J.

27